# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL FOREST RESOURCE COALITION, *et al.*,<br><br>          Plaintiffs,<br><br>          v.<br><br>THOMAS J. VILSACK, Secretary of Agriculture, *et al.*,<br><br>          Defendants,<br><br>          and<br><br>KLAMATH-SISKIYOU WILDLANDS CENTER, *et al.*,<br><br>          Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 12-1333 (KBJ) |

## MEMORANDUM OPINION

Congress has charged the United States Forest Service with the management of 155 national forests and 20 national grasslands covering over 180 million acres of forest and rangeland throughout the United States.  *See* 16 U.S.C. § 1604(a); 36 C.F.R. § 200.3(b)(2).  The Forest Service promulgates a "Planning" rule to achieve this mandate, *see* 36 C.F.R. § 219 *et seq*., and this set of regulations governs the Forest Service's development of individual land and resource management plans for the national forests and grasslands that the agency oversees.  Forest-resource stakeholders (such as environmental groups, recreational interest groups, and industry groups that promote timber harvest, mining, and grazing) have long debated the appropriate terms

of the Planning rule—*i.e.*, which specific procedural requirements the Forest Service should adopt to guide it in developing land use management plans—and the Forest Service has promulgated five successive Planning rules since 1979, each of which has been controversial, and some of which have even been invalidated by federal courts.

This case concerns the Forest Service's latest Planning rule, which was promulgated in 2012. *See* National Forest System Land Management Planning, 77 Fed. Reg. 21,162 (April 9, 2012) (codified at 36 C.F.R. pt. 219). Plaintiffs are a number of trade associations and nonprofit corporations that represent members of the timber/lumber industry, along with other groups whose members use national forest lands for recreation. The gravamen of Plaintiffs' complaint, which has been filed against Defendants Secretary of Agriculture Tom Vilsack in his official capacity and the Forest Service (collectively, "Defendants" or "the Government"), is the contention that the 2012 Planning Rule exceeds the Forest Service's statutory authority by requiring land management plans to privilege environmental goals, such as maintaining "ecological sustainability" and "ecosystem services," over other competing uses of national forests, such as logging, grazing, and recreation. Plaintiffs claim that by privileging environmental interests over other interests, the 2012 Planning Rule violates three separate statutes that set forth the purposes of the national forests: the Organic Administration Act of 1897 ("OAA"), 16 U.S.C. §§ 473–75, 477–82, 551; the Multiple-Use Sustained-Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528–31; and the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600–1614. Plaintiffs also argue that the 2012 Planning Rule is inconsistent with the OAA, MUSYA, and NFMA in a number of other respects, and that Plaintiffs were not afforded an adequate

opportunity to comment on the definitions of three words that are used in the 2012 Planning Rule—words that Plaintiffs believe are critically important to how the 2012 Planning Rule will be implemented.

Before this Court at present are the parties' cross-motions for summary judgment based on the administrative record.  Plaintiffs' motion reiterates the complaint's core contention that the 2012 Planning Rule is manifestly inconsistent with the OAA, MUSYA, and NFMA.  Defendants' motion argues, as a threshold matter, that Plaintiffs' case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs lack standing to challenge to the 2012 Planning Rule and this dispute is not yet ripe for adjudication.  On the merits, Defendants are joined by several environmental organizations that have intervened to argue that Defendants are entitled to summary judgment because the 2012 Planning Rule does not exceed Defendants' authority under the OAA, MUSYA, and NFMA.

On March 31, 2015, this Court entered an order stating that Plaintiffs' Motion for Summary Judgment was **DENIED**; Defendants' Motion to Dismiss was **GRANTED**; and the Intervenor-Defendants' Motion for Summary Judgment was **DENIED** as moot. This Memorandum Opinion explains the reasoning behind that ruling.  Specifically, this Court has concluded that it lacks subject matter jurisdiction with respect to Plaintiffs' claims, and thus cannot reach the merits of those claims, because Plaintiffs have failed to identify an injury-in-fact that they have suffered, or will imminently suffer, as a result of Defendants' promulgation of the 2012 Planning Rule.   In other words, Plaintiffs lack standing to challenge the 2012 Planning Rule in federal court, and as a result, Plaintiffs' lawsuit cannot proceed.

I.     **BACKGROUND**

A.     **Land And Resource Management Of National Forests**

The national forests of the United States are subject to "a dynamic management system, akin to a zoning ordinance, that regulates future project-level decisionmaking." Michael J. Gippert & Vincent L. DeWitte, *The Nature of Land and Resource Management Planning Under the National Forest Management Act*, 3 Envtl. Law. 149, 154 (1996).  Congress first authorized the United States Department of Agriculture ("USDA") to manage national forest lands—and first articulated the goals of the national forest management system—in the OAA, 30 Stat. 11, 34–36 (June 4, 1897) (codified as amended at 16 U.S.C. §§ 473–75, 477–82, 551), a statute that specifically provides that the national forest system exists for two purposes: "[1] to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and [2] to furnish a continuous supply of timber for the use and necessities of citizens of the United States."  16 U.S.C. § 475.  Congress augmented this initial statement of purposes in the MUSYA, 74 Stat. 215 (June 12, 1960) (codified as amended at 16 U.S.C. §§ 528–31), which states that "[i]t is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."  16 U.S.C. § 528. The MUSYA also specifically references the environmental resources management principles of "multiple use" and "sustained yield," and directs Secretary of Agriculture—who acts in this area through the Forest Service—"to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom."  *Id*. § 529; *see also id*. § 531(a) (defining "multiple use" as the "management of all the various

renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people"); *id.* § 531(b) (defining "sustained yield" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land").  According to the D.C. Circuit, "these statutes make clear a congressional intention that the national forests should play a significant role in supplying timber," and "[t]hey also, especially the later statutes, indicate a purpose to advance outdoor recreation[.]"  *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996).

Significantly for present purposes, in 1976, Congress enacted the NFMA, 90 Stat. 2949 (Oct. 22, 1976) (originally enacted as the Forest and Rangeland Renewable Resources Planning Act of 1974) (codified as amended at 16 U.S.C. §§ 1600–1614), a statute that expressly adopts the statutory purposes laid out in the OAA and MUSYA; makes additional findings; and establishes a detailed land and resource management scheme that the Forest Service must follow in order to further those purposes.   The NFMA, which seeks "to balance the protection of natural ecosystems on public lands with the industrial and recreational uses of those lands[,]" was Congress' attempt to address the conflicting interests that often vie for priority when forest resources are at stake.  Vanessa Wishart, *Before Beginning, Plan Carefully: A Call for Public Comment on the New Forest Planning Rule*, 2010 Wis. L. Rev. 1537, 1540.  Congress specifically acknowledged in the statute "the necessity for a long term perspective in planning" how renewable forest resources would be managed.  Forest and Rangeland Renewable Resources Planning Act of 1974, Pub. L. No. 93-378 §2 (codified as amended by the

NFMA at 16 U.S.C. §§ 1600–1614).  To this end, the NFMA commands the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System[.]"  16 U.S.C. § 1604(a).

Pursuant to the NFMA, the Forest Service regulates the land and resources of national forests through "a three-tiered regulatory approach to forest management, with different tiers existing at the national, regional and local levels." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 632 F. Supp. 2d 968, 970 (N.D. Cal. 2009); *see also* 16 U.S.C. §§ 1600 *et seq.*  The instant case involves the first tier—*i.e.*, the set of USDA regulations that outline the procedures that the Forest Service must follow in planning for resource allocation across all national forests.  *See* 16 U.S.C. § 1604(g).  The agency's "Planning" rule (as these regulations are titled) essentially lays out a series of steps for developing individual land and resource management plans for national forests, and the Planning rule thereby governs the Forest Service's future consideration of proposed activities on forest land at the regional and local levels.

Notably, the Planning rule itself is mandated in the NMFA, *see* 16 U.S.C. § 1604(g), and not only must the agency's Planning rule guide the development of land and resource plans that are consistent with the purposes of forest management articulated in the statutes discussed above, it must do so by incorporating specific requirements that the NMFA sets forth.  For example, the NMFA provides that the agency's Planning rule must be crafted to ensure, with respect to proposed projects, that there is compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370(h), 16 U.S.C. § 1604(g)(1); that "economic and environmental" factors are considered, *id.* § 1604(g)(3)(A); that the "diversity of plant and animal

communities" is provided for, *id.* § 1604(g)(3)(B); and that certain parameters for timber harvesting are adopted, *id.* § 1604(g)(3)(E)–(F).  As explained further below, Plaintiffs maintain that the USDA's most recently adopted Planning rule improperly prioritizes ecological sustainability, ecosystem services, and maintaining and restoring plant and animal communities, and thus diverges from the Forest Service's mandate and purposes of the national forest system as set forth in the NMFA, MUSYA, and OAA.

With the Planning rule as a guide for how to proceed, at the second tier of forest management, the Forest Service develops specific land and resource management plans ("forest plans") for each unit in the National Forest System.[1]  Like a zoning ordinance, a forest plan defines management areas and guides Forest Service actions with respect to units within those areas.  Forest plans establish management goals and broad standards and guidelines that apply to various regions; they generally do not authorize any particular on-the-ground action.  *See* Gippert & DeWitte, *supra* at 156–57 ("The [forest plan] is a guide designed to give broad management guidance and ensure that other legal requirements are fulfilled prior to 'critical' project decisions, such as the decision to begin timber harvesting, mining operations or road construction.").  Then, at the third tier, the Forest Service analyzes and approves project-level decisions, such as the decision to harvest timber or authorize grazing in a particular area.  *See id.*  No proposed site-specific project may go forward until it has been found consistent with the forest plan that has been developed pursuant to the Planning rule, *see* 16 U.S.C. §

---

[1] The word "unit" is not defined in the applicable statutes and regulations; however, that term appears to refer to a specific forest, rangeland, or grassland managed by the National Forest Service.  *See Forest Guardians v. Thomas*, 967 F. Supp. 1536, 1538 (D. Ariz. 1997) ("A unit is a specific forest within a particular region of the National Forest System. For example, Arizona and New Mexico constitute Region 3, the Southwestern Region. The six national forests in Arizona and the five national forests in New Mexico constitute 11 separate units within Region 3." (footnotes omitted)).

1604(i), and each project must also undergo the appropriate level of environmental review and public participation under NEPA and other applicable laws, *see, e.g., Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511–12 (9th Cir. 1992).[2]

Once the Forest Service decides to authorize a project pursuant to these three planning stages, the agency's decision is subject to judicial review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 728 (1998) (holding that without site-specific, on-the-ground activities, forest plans are not ripe for review).

## B.    Planning Rule Permutations—From 1979 To 2012

USDA promulgated the first Planning rule in 1979.  *See* National Forest System Land and Resource Management Planning, 44 Fed. Reg. 53,928 (Sept. 17, 1979) (to be codified at 36 C.F.R. pt. 219).  However, after a few short years, the Forest Service concluded that the 1979 Planning Rule was overly complex, and it promulgated a revised Planning rule in 1982 in order to streamline the process of developing forest plans.  *See* National Forest System Land and Resource Management Planning, 47 Fed. Reg. 43,026, 43,026 (Sept. 30, 1982) (to be codified at 36 C.F.R. pt. 219).  Thereafter, in the year 2000, the USDA promulgated a new Planning Rule, *see* National Forest System Land and Resource Management Planning, 65 Fed. Reg. 67,514, 67,515-16

---

[2] NEPA requires agencies to complete an Environmental Impact Statement ("EIS") for any federal agency action "significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), 40 C.F.R. § 6.207(a) (2010), so that agencies will "take a hard look at the environmental consequences of their actions[,]" *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1080 (N.D. Cal. 2007) (quoting *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004)).  An EIS requires intensive study into the impacts of a proposed action on the environment as well as all reasonable alternatives to the proposed action, followed by the drafting of a report, *see* 42 U.S.C. § 4332(C), and the Forest Service must make the Draft EIS available for public comment, *see* 40 C.F.R. § 1502.9(a)–(b).  Because ten-year Forest Plans and project-level activities generally constitute major federal actions that significantly affect the environment, they typically require the completion of an EIS.  *See* 16 U.S.C. § 1604(g)(1).

(Nov. 9, 2000) (to be codified at 36 C.F.R. pts. 217, 219), based on its finding that the 1982 Planning Rule no longer reflected contemporary scientific or technical knowledge and had led to a forest plan development process that was complex, costly, lengthy, and cumbersome, *see* National Forest System Land and Resource Management Planning, 77 Fed. Reg. at 21,163.  The 2000 Planning Rule was challenged in federal court, *see Citizens for Better Forestry v. U. S. Dep't of Agric.,* No. 3:01-cv-00728 (N.D. Cal. Feb. 16, 2001), and *Am. Forest and Paper Ass'n v. Veneman*, No. 1:01-cv-00871 (D.D.C. April 23, 2001), and the Forest Service decided to develop a new rule after an internal agency review concluded that implementation of the 2000 Planning Rule would be procedurally burdensome.  *See* National Forest System Land and Resource Management Planning, 67 Fed. Reg. 72,770, 72,771 (Dec. 6, 2002).[3]  This new Planning rule was issued in 2005, and a revised version was promulgated in 2008, but federal courts invalidated both efforts for failure to comply with the procedural obligations of the NEPA and the Endangered Species Act.  *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1089–90, 1097 (N.D. Cal. 2007); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 632 F. Supp. 2d 968, 980–82 (N.D. Cal. 2009).  The Forest Service then chose to continue conducting forest planning pursuant to the 1982 Planning Rule while developing a new Planning rule.  *See* National Forest System Land Management Planning, 74 Fed. Reg. 67,165, 67,166 (Dec. 18, 2009).  Consequently, the 1982 Planning Rule has guided the development of all individual forest plans currently in existence.

---

[3] Both lawsuits were dismissed after the Agency determined to undertake a new rulemaking.

The Forest Service engaged in a notice and comment period and the preparation of an EIS pursuant to NEPA in 2011, and it issued the final 2012 Planning Rule—the rule that is being challenged in the instant action—on April 9, 2012.  *See* National Forest System Land Management Planning, 77 Fed. Reg. at 21,162.  Consistent with the three-tiered management structure described above, the 2012 Planning Rule does not itself establish any particular land management plan or authorize any concrete action in furtherance of any existing land management plan.  Rather, the rule is a framework that consists, essentially, of two types of regulations: those that set forth the specific procedures that agency officials must utilize to develop land use plans in the future, and those that address the required components of any such plan.

For example, with respect to the procedural requirements agency officials must follow, the 2012 Planning Rule states that "[t]he responsible official shall use the best available scientific information to inform the planning process[,]" 36 C.F.R. § 219.3, and clarifies that "[p]lanning for a national forest, grassland, prairie, or other comparable administrative unit . . . is an iterative process that includes assessment (§ 219.6); developing, amending, or revising a plan (§§ 219.7 and 219.13); and monitoring (§ 219.12)[,]" *id.* § 219.5(a).  The 2012 Planning Rule further provides specific procedural guidance for agency officials with respect to each of these stages of the planning process, such as the directive that the official "shall provide opportunities to the public for participating" in the creation of any specific land management plan, *id.* § 219.4(a), and that, during the assessment phase, "[t]he responsible official shall consider and evaluate existing and possible future conditions and trends of the plan

area, and assess the sustainability of social, economic, and ecological systems within the plan area, in the context of the broader landscape[,]" *id.* § 219.5(a)(1).

The 2012 Planning Rule also sets forth a number of specific substantive provisions that must be included in all land management plans.  Section 219.8, for example, states that "[t]he plan must provide for social, economic, and ecological sustainability within Forest Service authority and consistent with the inherent capability of the plan area," and goes on to specify precisely what acceptable sustainability plan provisions should entail.  *Id.* § 219.8; *see also, e.g., id.* § 219.8(a) (stating that "[t]he plan must include plan components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area").   The 2012 Planning Rule contains similar directives regarding the inclusion of plan provisions related to plant and animal diversity, *id.* § 219.9(a); multiple uses and ecosystem services, *id.* § 219.10(a); and timber harvest requirements, *id.* § 219.11.

This all means that, in order to satisfy the requirements of the 2012 Planning Rule, each forest plan must not only have been developed pursuant to certain procedural steps, *see, e.g.*, *id.* § 219.7(c), it must also include certain substantive elements.[4] Accordingly, while the 2012 Planning Rule outlines the same overarching development process and management goals for every forest, each forest plan developed under the Rule will be unique—tailored through a public process to "reflect[] the unit's expected distinctive roles and contributions to the local area, region, and Nation, and the roles

---

[4] The precise content of the plan components is not dictated by the 2012 Planning Rule, instead, the Planning rule states that the content of the components should be crafted during the development of each forest plan in response to the unique needs of that forest.  *See* 77 Fed. Reg. at 21,207.

for which the plan area is best suited[.]"  36 C.F.R. § 219.2(b); *see also* 77 Fed. Reg. at

21,182 (noting that the Rule "allows flexibility for plans to reflect the different unique

circumstances across the National Forest System.").

### C.    Plaintiffs' Challenge To The 2012 Planning Rule

On August 13, 2012, Plaintiffs filed the instant complaint.  (*See* Complaint

("Compl."), ECF No. 1.)  The Plaintiffs in the instant action are 13 associations that

represent members of the timber, ranching, and forest recreation industries, to wit:  the

Federal Forest Resource Coalition, American Forest Resource Council, Blueribbon

Coalition, California Association of 4 Wheel Drive Clubs, Public Lands Council,

National Cattlemen's Beef Association, American Sheep Industry Association, Alaska

Forestry Association, Resource Development Council For Alaska, Inc., Minnesota

Forest Industries, Inc., Minnesota Timber Producers Association, California Forestry

Association, and Montana Wood Products Association, Inc. (collectively, "Plaintiffs").

Plaintiffs' complaint asserts 12 claims against the United States Forest Service and the

Secretary of Agriculture that are based on various provisions of the 2012 Planning

Rule; these claims can be summarized as follows.[5]

Claims 1, 2, and 3 of the complaint are based upon the language of the 2012

Planning Rule section that is titled "Sustainability" (36 C.F.R. § 219.8).   As noted

above, this provision states in part that land management plans "must provide for

social, economic, and ecological sustainability within Forest Service authority and

consistent with the inherent capability of the plan area."[6]  Plaintiffs assert that this

---

[5] Plaintiffs state in their summary judgment motion that one of their claims (Claim 9) has been resolved
by an amendment to the Planning Rule published after the filing of the complaint.  (Pl. Br. in Supp. of
Mot. for Summ. J., ECF No. 40-1, at 50-51.)
[6] "Sustainability" is defined in the Planning Rule as "[t]he capability to meet the needs of the present

provision violates the OAA (Claim 1), the NFMA (Claim 2), and the MUSYA (Claim 3), by "establish[ing] 'ecological sustainability' as [the] primary purpose of national forest management[.]"  (Compl. ¶¶ 22–33.)  In Plaintiffs' view, the relevant statutes set forth only "five statutorily-designated purposes of national forests[,]" *id.* ¶ 32— "outdoor recreation, range, timber, watershed, and wildlife and fish purposes[,]" 16 U.S.C. § 528—and none of these statutory purposes can be subordinate to "ecological sustainability" without violating the statutes that define the permissible purposes.

Claims 4, 5, and 6 of the complaint are based on a similar theory, but target a different provision of the 2012 Planning Rule.  These claims assert that 36 C.F.R. § 219.10 violates the OAA (Claim 4), the NFMA (Claim 5), and the MUSYA (Claim 6), by stating that land management plans "must provide for ecosystem services and multiple uses, including outdoor recreation, range, timber, watershed, wildlife, and fish, within Forest Service authority and the inherent capability of the plan area[.]"  36 C.F.R. § 219.10.  (*See* Compl. ¶¶ 34–44).[7]  According to Plaintiffs, the establishment of a "mandate to provide 'ecosystem services'" rules afoul of the statutory scheme by

---

generation without compromising the ability of future generations to meet their needs. For purposes of this part, 'ecological sustainability' refers to the capability of ecosystems to maintain ecological integrity." 36 C.F.R. § 219.19.  "Ecological integrity" is defined as "[t]he quality or condition of an ecosystem when its dominant ecological characteristics (for example, composition, structure, function, connectivity, and species composition and diversity) occur within the natural range of variation and can withstand and recover from most perturbations imposed by natural environmental dynamics or human influence." *Id.*

[7] "Ecosystem services" is defined in the 2012 Planning Rule as "[b]enefits people obtain from ecosystems, including: (1) Provisioning services, such as clean air and fresh water, energy, fuel, forage, fiber, and minerals; (2) Regulating services, such as long term storage of carbon; climate regulation; water filtration, purification, and storage; soil stabilization; flood control; and disease regulation; (3) Supporting services, such as pollination, seed dispersal, soil formation, and nutrient cycling; and (4) Cultural services, such as educational, aesthetic, spiritual and cultural heritage values, recreational experiences, and tourism opportunities." 36 C.F.R. § 219.19.

"establish[ing] an entirely new category of national forest uses" that is nowhere provided for in any of the relevant statutes. (*Id*. ¶ 35)

Claim 7 of the complaint targets an alleged disconnect between the 2012 Planning Rule and the NFMA's requirement that land management plans "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives[.]" 16 U.S.C. § 1604(g)(3)(B). Plaintiffs claim that 36 C.F.R. § 219.9—which directs that land management plans must "provide the ecological conditions necessary to: contribute to the recovery of federally listed threatened and endangered species, conserve proposed and candidate species, and maintain a viable population of each species of conservation concern within the plan area"—violates the NFMA because it does not make the requirement to maintain viable populations of plant and animal species contingent upon the "overall multiple-use objectives" specified by the statute. (Compl. ¶¶ 45–48.)

Claim 8 of the complaint takes issue with the fact that the 2012 Planning Rule requires the official responsible for preparing a land management plan to "use the best available scientific information to inform the planning process required[.]" 36 C.F.R. § 219.3. According to Plaintiffs, this "best available scientific information" ("BASI") requirement contradicts the directive in the NFMA that "[i]n the development and maintenance of land management plans," the Forest Service "shall use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." 16 U.S.C. § 1604(b). Plaintiff contends that the BASI requirement imposes an unlawful limitation on the types of information that can be considered in devising a land management plan. (Compl. ¶¶ 49–54.)

Claim 10 of the complaint is based on a provision of the 2012 Planning Rule that is entitled "[l]imitations on timber harvest[,]" which provides in part that "[n]o timber harvest for the purposes of timber production may occur on lands not suited for timber production." 36 C.F.R. § 219.11(d). Plaintiffs claim that this provision violates the NFMA because, while that law does provide that no timber harvest shall occur on lands that are "not suited for timber production[,]"16 U.S.C. § 1604(k), the statute also provides several exceptions to this general rule that are not stated in the 2012 Planning Rule. In particular, Plaintiffs point to language in the NFMA that exempts "salvage sales or sales necessitated to protect other multiple-use values" from the timber harvest prohibition. 16 U.S.C. § 1604(k), *see also id*. §§1604(m), 1611(a). Plaintiffs claim that the omission of the exception for "salvage and sanitation harvesting" from the 2012 Planning Rule constitutes a violation of the NFMA. (Compl. ¶¶ 58–65.)

Claim 11 of the complaint is procedural in nature. (*See id*. ¶¶ 66–77.) In this claim, Plaintiffs allege that Defendants have violated the NFMA and the APA by incorporating new definitions into the final Planning rule that were not included in the proposed rule that was posted for public comment. (*See id.*) In particular, Plaintiffs claim that "[t]he final rule contains three new definitions critical to forest planning that were not contained in the draft rule and were never subject to public comment— ecological integrity, riparian zone and riparian management area." (*Id*. ¶ 68.) Plaintiffs claim that the Forest Service's failure to submit these definitions for public comment violates the NFMA, which states that the Secretary of Agriculture "shall establish procedures" directed towards "giv[ing] the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of

standards, criteria, and guidelines applicable to Forest Service programs."  16 U.S.C. § 1612(a).  (*See* Compl. ¶ 76.)  Plaintiffs also allege that this procedure violates the APA's public notice of rulemaking requirements, codified at 5 U.S.C. § 553.  (*Id.*)

Finally, Claim 12 of the complaint alleges that the Planning Rule contains an unlawful definition of the term "sustainable recreation."  (*Id.* ¶¶ 78–81.)[8]  Plaintiffs claim that, while the MUSYA and NFMA allow "outdoor recreation" as a permissible purpose for which national forests can be used, the 2012 Planning Rule requires that land management plans include components addressing "sustainable recreation," without any provision for other types of recreation that might fall under the language of the statutes.  (*Id.* ¶ 79.)  Plaintiffs thus claim that the definition of "sustainable recreation" in the 2012 Planning Rule impermissibly narrows the range of recreational activities that can be allowed under a land management plan because this new definition will permit land management plans to ban certain types of recreation that the statute contemplates should be allowed in national forests.  (*Id.* ¶¶ 80, 81.)

As relief, Plaintiffs seek a declaration that the Forest Service has violated the OAA, MUSYA, NFMA, and APA; an order vacating and remanding the 2012 Planning Rule; an injunction prohibiting Defendants from taking any action to begin or continue land management plan revisions under the Planning Rule; and attorneys' fees. (*See id.* at 26.)

---

[8] "Sustainable recreation" is defined in the 2012 Planning Rule as "[t]he set of recreation settings and opportunities on the National Forest System that is ecologically, economically, and socially sustainable for present and future generations."  36 C.F.R. § 219.19.

## II.   PROCEDURAL HISTORY

Approximately one month after Plaintiffs filed their complaint, four environmental organizations—Klamath-Siskiyou Wildlands Center, Oregon Wilds, Wilderness Society, and Defenders of Wildlife—moved to intervene as defendants in this matter.  (*See* Mot. to Intervene by Klamath-Siskiyou Wildlands Center and Oregon Wild, ECF No. 12; Mot. to Intervene by Wilderness Society and Defenders of Wildlife, ECF No. 16.)  The Court granted those motions on December 10, 2012.  (*See* Memorandum Order, ECF No. 28 (Leon, J.).)  Thereafter, both Defendants and Defendant-Intervenors answered Plaintiffs' complaint.  (*See* Answer to Complaint by Federal Defendants, ECF No. 24; Answer to Complaint by Klamath-Siskiyou Wildlands Center and Oregon Wild, ECF No. 29; Answer to Complaint by Wilderness Society and Defenders of Wildlife, ECF No. 31.)  Defendants filed the administrative record on February 28, 2013.  (*See* Administrative Record, ECF No. 36.)[9]  The case was assigned to the undersigned on April 9, 2013.  (*See* Minute Entry, Apr. 9, 2013.)

On June 5, 2013, Plaintiffs filed a motion for summary judgment.  (*See* Mot. for Summ. J., ECF No. 40.)  In that motion, Plaintiffs first assert that they satisfy both the constitutional and prudential standing requirements necessary to make this case justiciable.  (Pls.' Br. in Supp. of Mot. for Summ. J. ("Pl. Br."), ECF No. 40-1, at 17–25.)[10]  With respect to the merits of their case, Plaintiffs argue that they are entitled to summary judgment on their claims because, in Plaintiffs' view, "the 2012 Rule represents a sea change for national forest management[,]" and "Congress has [not]

---

[9] Citations to the administrative record for the 2012 Planning Rule will be made as PR_xx.

[10] Page numbers refer to the page numbers that the Court's electronic filing system assigns.

delegated the Forest Service sufficient authority to accomplish its paradigm shift solely through rulemaking without legislative action." (*Id.* at 15.)

On August 13, 2013, Defendants filed a cross-motion for summary judgment. (*See* Cross-Mot. for Summ. J., ECF No. 42.)  Defendants argue that "this case does not present a justiciable case-or-controversy and fails on grounds of both standing and ripeness[,]" and that the Court should therefore dismiss Plaintiffs' complaint for lack of subject matter jurisdiction.  (Defs.' Br. in Supp. of Cross-Mot. for Summ. J. ("Def. Br."), ECF No. 42-1, at 10.)  Defendants also argue that, even if this Court reaches the merits of Plaintiffs' case, it should nevertheless deny Plaintiffs' motion for summary judgment and enter judgment in Defendants' favor because, in Defendants' view, "the [2012] Planning Rule is a reasonable exercise of the USDA's broad authority to manage the [National Forest System] to meet the needs of the American people, and the procedures followed by the Department fully comport with the APA."  (*Id*. at 10–11.)

On August 23, 2013, Defendant-Intervenors also filed a motion for summary judgment.  (*See* Mot. for Summ. J., ECF No. 43.)  Defendant-Intervenors do not address the Court's jurisdiction over this case; however, like Defendants, Defendant-Intervenors argue that Plaintiffs "are not entitled to summary judgment on any of their claims because they fail to overcome the vast discretion conveyed by Congress to [Defendants] to develop a comprehensive set of rules to guide management of the 176 units of the National Forest System."  (Intervenors' Br. In Supp. of Cross-Mot. for Summ. J. ("Int. Br."), ECF No. 43-1, at 6.)

These motions were fully briefed on January 24, 2014.  This Court held a hearing on April 29, 2014.  (*See* Minute Entry, Apr. 29, 2014.)

18

## III.    LEGAL STANDARDS

### A.    Standing

Article III of the United States Constitution "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies[,]'" *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.,* 454 U.S. 464, 471 (1982), and the doctrine of standing serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III" and thus "'are appropriately resolved through the judicial process,'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  "In this sense, the standing requirement acts as a gatekeeper, opening the courthouse doors to narrow disputes that can be resolved merely by reference to facts and laws, but barring entry to the broad disquiets that can be resolved only by an appeal to politics and policy."  *Food & Water Watch, Inc. v. Vilsack*, No. 14-cv-1547, 2015 WL 514389, at *6 (D.D.C. Feb. 9, 2015).

To establish the "irreducible constitutional minimum of standing[,]" a plaintiff must allege (1) an "injury in fact" that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." *Defenders of Wildlife,* 504 U.S. at 560–61 (internal quotation marks and citations omitted).  "The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148–49 (2013) (citations, internal quotation marks, and alterations omitted).  "[A] plaintiff must

demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation and internal quotation marks omitted).

Significantly, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). Indeed, "courts [only] occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004). The D.C. Circuit has identified "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party." *Renal Physicians Ass'n v. U.S. Dept. of Health & Human Servs.*, 489 F.3d at 1275 (D.C. Cir. 2007). "First, a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *Nat'l Wrestling Coaches*, 366 F.3d at 940. In this circumstance, a plaintiff must show that the challenged government conduct authorizes the specific third-party conduct that causes injury to the plaintiff. *See Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) ("Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries[.]"). A court may also find that a party has standing to challenge government action that authorizes third-party conduct "where the record

present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Nat'l Wrestling Coaches*, 366 F.3d at 941.  When such is the case, the plaintiff must allege facts that are "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought."  *Renal Physicians*, 489 F.3d at 1275.

### B.  Summary Judgment In APA Cases

As a general matter, summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  *Loma Linda Univ. Med. Ctr. v. Sebelius,* 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing *Stuttering Found. of Am. v. Springer,* 498 F. Supp. 2d 203, 207 (D.D.C. 2007)); *see also Richards v. INS*, 554 F.2d 1173, 1177 n.28 (D.C. Cir. 1977).

Agency action challenged under the APA shall be set aside when the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" *id.* § 706(2)(C).  When determining whether

an agency action exceeds the power granted by Congress in a statute, courts apply the

two-step analysis described in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,

467 U.S. 837, 843 (1984).  Pursuant to *Chevron*'s first step, if "Congress has directly

spoken to the precise question at issue[,]" a court "must give effect to the

unambiguously expressed intent of Congress." *Id.* at 842–43.  Thus, if a challenged

regulation conflicts with the clearly expressed intent of the statute, it is deemed invalid

and the court's *Chevron* analysis is at its end. *See, e.g.*, *Orion Reserves Ltd. P'ship v.

Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("'A regulation which . . . operates to

create a rule out of harmony with the statute is a mere nullity.'" (alteration in original)

(quoting *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134

(1936)).  If, however, "the statute is silent or ambiguous with respect to the specific

issue, the question for the court is whether the agency's answer is based on a

permissible construction of the statute." *Chevron*, 467 U.S. at 843; *see also Barnhart v.

Walton*, 535 U.S. 212, 218 (2002) (explaining that the reviewing court's task at step two

of the *Chevron* analysis is to determine "whether the [agency] interpretation . . .

exceeds the bounds of the permissible").

## IV.   ANALYSIS

Standing is a "threshold question in every federal case," *Warth v. Seldin*, 422

U.S. 490, 498 (1975), because, as explained above, standing relates to the Court's

jurisdiction. *See Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 88 (1998).

Where, as here, an organization—or a group of organizations—seeks to sue on behalf of

its members, the organization must demonstrate that "(a) its members would otherwise

have standing to sue in their own right; (b) the interests it seeks to protect are germane

to the organization's purpose; and (c) neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State*

*Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs here are 13 organizations that use the national forests for timber

harvest, livestock grazing, and recreation.[11]  Plaintiffs seek to clear the standing hurdle

by identifying overarching injuries that they claim their members have suffered (or will

imminently suffer) as a result of the 2012 Planning Rule and that a court order

invalidating that regulation would redress.  First, Plaintiffs assert that their members are

"imminently threatened with economic harm" (Pl. Br. at 17) because Defendants'

promulgation of the 2012 Planning Rule will necessarily result in a reduction in the

timber harvest and the availability of public land for grazing and recreational use.  (*See*

---

[11] Seven plaintiff organizations have members who use the national forests for timber harvest.
Plaintiffs Federal Forest Resource Coalition, American Forest Resource Council, Alaska Forest
Association, and California Forestry Association are trade associations whose members manufacture
wood products using raw materials from national forests and from forest lands that are adjacent to
national forests.  (*See* Compl. ¶ 4, 5, 11, 15.)  Plaintiffs Minnesota Forest Industries, Minnesota Timber
Producers Association, Montana Wood Products Association are nonprofit corporations that represent
loggers, small sawmills, and truckers who operate in and near national forests.  (*See id.* ¶ 13, 14, 16.)
All of the timber-harvest Plaintiffs believe that the proper management of the National Forest System—
which in their view, includes an emphasis on promoting timber-harvest—is vital to their economic
interests.  (*See id*. ¶ 4–5, 11, 13–16.)
     Three of the plaintiff organizations have members who use the national forests for livestock
grazing.  National Cattlemen's Beef Association is a nonprofit corporation that represents cattle
producers who hold grazing permits and leases authorizing livestock grazing on national forest lands.
(*See id.* ¶ 9.)  Similarly, Plaintiff American Sheep Industry Association is a nonprofit corporation that
represents sheep producers that graze sheep on national forest lands.  (*See id.* ¶ 10.)  Plaintiff Public
Lands Council is a nonprofit organization that represents both cattle and sheep producers.  (*See id.* ¶ 8.)
All of the livestock grazing Plaintiffs believe that "[t]he ability to graze livestock on federal lands,
including federal lands managed by the U.S. Forest Service, is vitally important[.]"  (*Id.*)
     The members of two of the plaintiff organizations use the national forests for recreational
purposes.  Plaintiff BlueRibbon Coalition and California Association of 4 Wheel Drive Clubs use the
dirt roads and trails through national forest land for biking, hiking, and driving off-road vehicles.  (*See
id*. at ¶ 6, 7.)
     Finally, Plaintiff Resource Development Council for Alaska "is a statewide business
association comprised of individuals and companies from Alaska's oil and gas, mining, forest products,
tourism and fisheries industries."  (*Id*. ¶ 12.)  The Resource Development Council for Alaska purports
to be concerned that the Planning Rule will restrict uses that contribute to economic development,"
because "forest planning determines the mix of uses allowed on particular areas of the national forests
including the Tongass and Chugach National Forests."  (*Id*.)

*id*. at 19–22.)  Second, Plaintiffs maintain that the 2012 Planning Rule poses an "imminent threat of environmental injury" because "overcrowded, unmanaged forests" increase the risk of destructive wildfires that harm their members' interests.  (*Id.* at 22.) Third, Plaintiffs contend that their members have suffered a procedural injury because the Forest Service failed to provide an opportunity for public comment on certain provisions of the 2012 Planning Rule.  (*Id.* at 23–24.)

For the reasons that follow, this Court concludes that Plaintiffs have not demonstrated that the 2012 Planning Rule has caused, or imminently will cause, their members to suffer an injury-in-fact, as the law requires, nor have Plaintiffs established a procedural injury that gives rise to standing to bring the claims alleged in Plaintiffs' complaint.

**A.    Plaintiffs Have Failed To Show That The 2012 Planning Rule Has Caused (Or Imminently Will Cause) Their Members To Suffer An Injury**

Plaintiffs make a series of injury-related arguments that stem from their organizational interests; the description of these alleged injuries must be fully fleshed out in order to be adequately understood.  First up are the timber-harvest Plaintiffs, who contend that the 2012 Planning Rule will perpetuate a pre-existing downward trend in the amount of timber harvested from national forests.  (*See* Pl. Br. at 19 ("Under the current trend in the Forest Service's timber program, timber harvest has declined by more than 80% [i]n the national forests over the last two decades." (internal quotation marks and citation omitted)).)  The timber-harvest Plaintiffs argue that, as a result of the continued reduction in the amount of timber that is permitted to be harvested, their members will suffer direct economic harm from their inability to get as much timber from the national forests under the 2012 Planning Rule as they would like.  (*See id*.

(noting the "demise of many" members, "with the fates of others still hanging precariously in the balance").)  The timber harvesters also assert that the 2012 Planning Rule's perpetuation of the downward trend in timber harvesting will lead to overcrowded forests, and that "as timber harvest levels have declined, more and more fuel accumulates, and there has been an accompanying increase in the loss of forests to wildfire."  (*Id.* (citing Decl. of Thomas Partin, President of the American Forest Resource Council, ECF No. 40-4, ¶¶ 7–10).)  And because certain of their members (some timber industry groups) own private forest lands that are adjacent to national forests, the timber-harvest Plaintiffs emphasize the risk that wildfires and insects in the national forests could spread, thereby causing harm to these members.  (*See id.*)

The livestock-grazing Plaintiffs sound a similar note of alarm about the allegedly harmful effects of the 2012 Planning Rule.  These Plaintiffs highlight a statement in the 2012 Planning Rule's EIS that explains: "'where livestock grazing is identified as a stressor, allotment management plans would be expected to be modified (*e.g.*, through reductions in numbers, changes in season of use, or additional improvements).'"  (*Id.* at 20 (quoting PR_0103713–14), and based on this statement, they argue that the 2012 Planning Rule will decrease the amount of national rangeland available for grazing. (*Id.*)  These Plaintiffs contend that their rancher members "rely on Forest Service rangeland to meet their livestock grazing needs" and thus "will suffer a concrete and particularized economic injury from the Rule via its restriction of grazing access to rangeland." (*Id.*)  Moreover, the livestock-grazing Plaintiffs also "share the timber plaintiffs' concerns regarding wildfire damage to lands managed by the Forest Service" (*id.*) because an increased risk of wildfires in the national forests "poses an imminent

threat to the welfare of livestock and also threatens grazing permittees with sudden evictions from federal lands in the aftermath of the fire[,]" (*id.* at 21.)

This last alleged concern—that there will be an increase in the incidence of wildfires and insect infestations in the national forests as a result of the 2012 Planning Rule—is the injury that also purportedly impacts recreational users of national forests. According to Plaintiffs, "forest recreationalists . . . have a long-standing interest in the protection of the values and natural resources" of forests, and this interest "does not dovetail with destructive wildfire." (*Id.* at 22 (internal quotation marks and citation omitted).)   In discussing the wildfire concerns of recreational users of forest lands, Plaintiffs maintain that "the deleterious effects of wildfire on their recreation experiences are not based on conjecture" because such fires lead to "closures to, or understandable avoidance of, camping, off-highway vehicle use and other recreational pursuits[.]" (*Id.* at 22–23.)

The lynchpin of all of the alleged injuries that will purportedly befall each of Plaintiffs' subgroups is, of course, the common contention that Defendants' promulgation of the 2012 Planning Rule *will, in fact, reduce the amount of forest land available for commercial use (timber and grazing) and will lead to overgrown and unmanaged forests* giving rise to wildfires and insect infestations.  But unfortunately for Plaintiffs, and as explained fully below, it is at this very first link in the causal chain of injury that Plaintiffs' standing argument falters.  In short, Plaintiffs have not demonstrated that the 2012 Planning Rule actually will cause the harmful reduction in timber harvest and land use that Plaintiffs maintain will be so detrimental to their membership, much less that any such reduction would follow "imminently" from

implementation of the Rule or that any such reductions would occur with respect to the land management plans that govern the particular forests that the members of Plaintiffs' organizations currently use.  Moreover, even if one could surmise that the 2012 Planning Rule would imminently cause allegedly troublesome reductions in timber harvest and livestock grazing in relevant geographical areas, Plaintiffs have not shown that those reductions substantially increase the risk of wildfires such that, on the basis of this risk injury, Plaintiffs can be deemed to have an injury-in-fact giving rise to standing to sue.

> 1. <u>Plaintiffs' Contention That The 2012 Planning Rule Will Cause Reductions In Land Use That Will Injure Them Economically Is Sheer Speculation</u>

Plaintiffs' argument that the 2012 Planning Rule will injure them economically (and thus that they have standing to bring this lawsuit challenging that Rule) hinges on Plaintiffs' assertion that the Rule will reduce the supply of timber available for harvesting on national forest lands and will reduce the availability of national forest lands for livestock grazing.  (*See* Pl. Br. at 19–23.)  But even a cursory review of the record belies any contention that Plaintiffs have shown that the alleged injury to the economic interests of their timber harvester and rancher members follows imminently from the Rule Plaintiffs seek to challenge, nor have Plaintiffs established that there is any causal link whatsoever between the 2012 Planning Rule and the reduction in timber-harvest or grazing land that is the basis of their alleged economic injury—and the record demonstrates otherwise.

With respect to the imminence requirement, one need look no further than the three-tier system of land use planning that Congress adopted in the NFMA to recognize the obvious flaw in Plaintiffs' theory of economic harm as a basis for standing to

challenge the 2012 Planning Rule.  As explained above, the 2012 Planning Rule is akin to a charter—*i.e.,* an amalgamation of first principles—that Forest Service officials must follow when developing regional forest plans, which, in turn, govern decision making with respect to site-specific issues, such as the amount of timber harvest or grazing that will be permitted in a particular area.  The 2012 Planning Rule does not, in itself, set particular timber-harvest or animal-grazing levels; in fact, the Rule specifically directs each national forest system unit to establish timber-harvest levels based upon the site-specific considerations the NFMA requires, *see* 36 C.F.R. § 219.11(d), and specifies that grazing levels will be "determined in individual plans and at the site-specific level," 77 Fed. Reg. at 21,162.  This means that there are several intervening decision points between the 2012 Planning Rule and the overall decrease in timber harvest and grazing that Plaintiffs decry, and because the individual forest plans that are ultimately developed pursuant to the 2012 Planning Rule might even establish timber harvest and grazing levels that are *higher* than existing plans, an injurious decrease in timber harvest and grazing levels does not follow inevitably from Defendants' promulgation of the Rule.  Thus, the key standing criterion of imminence is clearly lacking.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006); *Whitmore*, 495 U.S. at 158; *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983); *cf. Clapper*, 133 S. Ct. at 1149 (2013) (holding that "because [the challenged statute] at most *authorizes*—but does not *mandate* or *direct*—the [injury] that respondents fear, respondents' allegations are necessarily conjectural" and therefore are not imminent) (emphasis in original).

What is more, the EIS prepared in conjunction with the 2012 Planning Rule states merely that the agency expects that "current trends in the NFS timber program [will] continue[.]" (PR_0103714).  Plaintiffs latch on to this contention, coupling it with the observation that timber-harvest levels have declined for several decades (PR_0103868), and they argue that this continuing downward trend in the amount of timber harvested "has led to the [economic] demise of many [of Plaintiffs'] members, with the fates of others still hanging precariously in the balance."  (Pl. Br. at 19.)  But the fact that there is a pre-existing trend toward declining timber-harvest levels clearly undermines Plaintiffs' economic injury standing argument rather than bolstering it, because that fact nullifies any assertion that the 2012 Planning Rule is itself the cause of the decline and the resulting economic injury to Plaintiffs' members.  Indeed, the record establishes (and Plaintiffs apparently concede) that the decline in timber harvest is attributable to forces other than the 2012 Planning Rule (*see* PR_0103870; *see also* PR_0103868 (noting that the current trend in timber harvest on NFS lands is not the result of a particular management regime, but reflects a broader shift over several decades "from primarily producing timber to restoring and maintaining healthy ecological conditions and meeting the recreational and amenity preferences of the public."); therefore, that trend may continue regardless of the particular management regime selected by the Forest Service.[12]  Thus, far from proving that the 2012 Planning Rule will *cause* timber harvest and grazing permits to be set at levels injurious to

---

[12] Indeed, the EIS found that the historic trend in timber harvest levels would continue under all of the six alternative rules considered by the USDA.  (*See* PR_0103874 (Alternative A and Modified Alternative A); PR_0103875 (Alternative B); PR_0103877 (Alternative C); PR_0103878 (Alternative D); PR_0103880 (Alternative E)).

Plaintiffs' members, the record evidence shows merely that the 2012 Planning Rule will "[m]aintain[] the status quo with respect to timber harvest" (Pl. Br. at 21)—a set of circumstances that Plaintiffs obviously dislike but that fail to support any conclusion that the 2012 Planning Rule has caused, or imminently will cause, the Plaintiffs' injuries for standing purposes.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) ("[T]he 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.").[13]

Undaunted, Plaintiffs appear to assert that, regardless of the many discretionary steps between the 2012 Planning Rule and an injurious site-specific land use determination, and setting aside the fact that other factors have contributed to the pre-existing decline in harvest levels, by its very nature, the 2012 Planning Rule necessarily will cause a harmful decrease in timber harvest and grazing land that will injure Plaintiffs' members.  (Pls.' Reply in Supp. of Summ. J. ("Pl. Reply"), ECF No. 45 at 11 ("The nature of forest management dictates that when more of the fixed acreage of the national forest system is dedicated to 'ecological sustainability,' or 'viable populations' or 'ecosystem services,' fewer acres will remain available for the statutorily-designated uses of timber, grazing and recreation.").)  But the mere fact that the 2012 Planning Rule requires "ecological sustainability" does not solve Plaintiffs' lack of imminence or

---

[13] Notably, Plaintiffs' interest in having the Forest Service promulgate a regulation that would stop the current decline of timber harvesting does not give rise to standing to challenge a rule that purportedly fails to do so (*i.e.*, the 2012 Planning Rule).  *See Valley Forge Christian Coll.*, 454 U.S. at 483 ("[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.").

causation problems because, as Defendants point, out "[Plaintiffs] err[] in assuming that forest uses are mutually exclusive; that for example, ecological sustainability and timber harvest cannot be achieved in the same location."  (Defs.' Reply Mem. in Supp. of Cross-Mot. for Summ. J. ("Def. Reply"), ECF No. 49 at 11 (citing EIS finding (at PR_0103867) that between 2006 and 2011, "only 11 percent of timber harvest was conducted for the sole purpose of producing timber products; [t]he remaining 89 percent included additional purposes, including hazardous fuels reduction, wildlife habitat restoration, and watershed restoration").)  In fact, the Rule calls for exactly this type of "integrated resource management," directing the Forest Service to develop plans that provide for multiple uses "*[w]hile*" meeting the needs sustainability and diversity. 36 C.F.R. § 219.10 (emphasis added).  This means that the 2012 Planning Rule cannot be faulted for necessarily and inevitably requiring a reduction in timber harvest and grazing due to its sustainability mandates, and Plaintiffs do not show that the Rule otherwise dictates how many acres are available for one use or another.[14]

All told, Plaintiffs ultimately appear to rest their allegations of economic injury for standing purposes upon the outcome *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C. Cir 1996).  (*See* Pl. Br. at 18; Pl. Reply at 12 ("The

---

[14] To the extent that Plaintiffs' scarce resources allegations relate to the competitive-standing argument that the "affected parties are competing for a fixed amount of resources" (Pl. Reply at 20), that doctrine is only applicable where a regulatory decision "imposes a competitive injury, *i.e.*, that provides benefits to an existing competitor or expands the number of entrants in the petitioner's market[.]" *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002).  Plaintiffs here fail to identify an existing competitor who benefits from the Rule, or to explain how the Planning Rule expands the number of entrants in the market, and thus the competitive standing doctrine is inapplicable here. *See Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) ("[T]he basic requirement common to all our cases is that the complainant show an actual or imminent increase in competition[.]")  Moreover, given Plaintiffs' failure to establish that the Rule actually results in a reduced pool of forest resources, it would seem that Plaintiffs have not successfully skirted the broader causation and imminence problems despite their glancing reference to market competition.

controlling authority here is the D.C. Circuit's holding in *Mountain States Legal Foundation*[.]").)  That case involved the Forest Service's environmental review of a national forest that resulted in an EIS outlining 14 alternate plans with varying degrees of timber harvesting.  *See Mountain States*, 92 F.3d at 1231.  The Forest Service selected one of the plans, and then several timber industry associations sued the agency for not selecting a different plan with a higher level of harvesting.  *See id.*  Reversing the district court, the D.C. Circuit found that those plaintiffs had standing based both on the lower level of timber harvesting and on the increased risk of wildfires.  *See id.* at 1233–35.  As to timber harvesting in particular, the D.C. Circuit noted that "[g]overnment acts constricting a firm's supply of its main raw material clearly inflict the constitutionally necessary injury."  *Id.* at 1233.

However, despite the similarity between aspects of *Mountain States* and the circumstances presented in the instant case, Plaintiffs' reliance on that case is misplaced because it ignores a crucial factual distinction: unlike the forest plan that was under scrutiny in *Mountain States*, the 2012 Planning Rule that Plaintiffs challenge here *says nothing about the level of harvesting for any particular national forest*.  That is, in *Mountain States*, there was no question that the plan the Forest Service selected would result in a lesser harvest than the plan favored by the plaintiffs (*i.e.*, that the government action would imminently cause the feared harm) because the plan actually set the level of timber harvesting.  By contrast, here, the 2012 Planning Rule merely sets forth the parameters for subsequent forest plans such as the one at issue in *Mountain States*, and in this Court's view, that distinction makes all the difference.  In other words, because there is nothing in the instant record that reveals whether the 2012

32

Planning Rule will increase or decrease the level of timber harvest and the amount of land available for grazing—and indeed, the Rule allows for either result—the D.C. Circuit's analysis in *Mountain States* does not support Plaintiffs' claims that they will suffer an imminent economic injury as a result of the 2012 Planning Rule.[15]

In sum, while Plaintiffs argue that their members have standing to challenge the 2012 Planning Rule based on the feared harm to their economic bottom lines—*i.e.*, their ability "to maintain timber supply" from national forests (Pl. Br. at 18) and/or "to graze livestock on federal lands managed by the Forest Service" (*id.* at 20)—they have failed to demonstrate that the 2012 Planning Rule itself is the cause of the harms they fear (as opposed to other forces), or that the Rule poses an imminent threat to their economic interests.  Consequently, Plaintiffs have not satisfied the causation or imminence requirements for establishing Article III standing.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 505–06 (1975) (finding that plaintiffs lacked standing because there was no evidence that defendant's actions caused plaintiff's injuries); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 806–07 (D.C. Cir. 1987) (same).

      2. <u>Plaintiffs Have Failed To Identify A Specific Land Management Plan Promulgated Pursuant To The 2012 Planning Rule That Threatens To Harm Their Economic Interests</u>

Even if Plaintiffs could show that the 2012 Planning Rule will imminently cause a general reduction in the amount of forest, grassland, and rangeland available for commercial use, Plaintiffs have not identified a *specific* land management plan

---

[15] In their reply brief, Plaintiffs assert that the USDA's fiscal year 2014 budget request from Congress, which calls for a 15% reduction in national forest timber sales, provides evidence of the effect of the planning rule, since "[n]o management change has occurred on national forests between fiscal year 2013 and fiscal year 2014 *except* adoption of the rule."  (Pl. Reply at 13 (emphasis in original).)  This claim is not supported by authority and appears to be false, as Defendants point out that, in Congressional testimony, the head of the Forest Service attributed the decline to the sequester, not to the Planning Rule.  (Def. Reply at 14.)

promulgated pursuant to the 2012 Planning Rule that threatens to harm the members of the plaintiff organizations in this case.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 495–96 (2009) (holding that a plaintiff has standing to challenge rules governing an agency's conduct in "project planning" only if the plaintiff can identify a specific project to which those rules were applied and, as a result of which, the plaintiff has suffered or will suffer injury); *see also Defenders of Wildlife v. Persciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013) (explaining that "an injury is particularized if it affects the party asserting standing in a personal and individual way") (internal quotation marks and citation omitted).  Indeed, it appears that Plaintiffs here cannot even begin to clear the particularization hurdle because *no* individual forest plans have been created pursuant to the 2012 Planning Rule.

Plaintiffs resist the characterization of their alleged economic injury as too remote and not particularized by pointing to *Mountain States* and arguing that, "[l]ike the injury flowing from the timber restrictions in [*Mountain States*], the timber plaintiffs' members across the United States are concretely injured by the Rule, which has the same harmful impact on timber sales nationally as the forest-wide timber sale reduction in [*Mountain States*]."  (Pl. Reply at 13.)  But, again, the agency action in *Mountain States* actually set the level of timber to be harvested, and it was therefore possible to identify the actual economic harm that would follow from the agency's determination.  Here, Plaintiffs make the baffling assertions (1) that they have no duty to demonstrate actual economic injury to their members (*see* Pl. Reply at 15 ("Plaintiffs do not have to point to a specific piece of ground where a timber sale or grazing will be prohibited to show that their economic injury is particularized."); (2) that "[n]o case has

ever held that a plaintiff must show the geographic source of economic injury to establish Article III standing"; and (3) that, with respect to being required to show particular harmful prohibitions in timber harvesting and grazing as a result of the 2012 Planning Rule, "it is impossible to prove a negative by showing where an action has *not* occurred" (*id.* (emphasis in original)).  Plaintiffs' reasoning clearly misunderstands the point of the particularized injury mandate, which requires *precisely* the kind of "personal and individual" showing of injury that Plaintiffs denounce.  *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 541 (2007) ("Central to th[e] concept of particularized injury is the requirement that a plaintiff be affected in a personal and individual way, and seek relief that directly and tangibly benefits him in a manner distinct from its impact on the public at large." (citations and internal quotation marks omitted)); *Lujan*, 504 U.S. at 560 n. 1 (stating that to have standing, the plaintiff must have suffered a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way"); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 543–544 (1986) (noting that a plaintiff who "has no personal stake in the outcome of the litigation" has no standing); *Simon*, 426 U.S. at 39 ("The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement").

The Supreme Court's decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), helps to illustrate why Plaintiffs' 'no need for particularization' argument is so off base.  In *Summers*, the Court considered a challenge brought by environmental groups with respect to a Forest Service regulation exempting certain timber salvage sales (those involving less than 250 acres of forest) from the notice and comment period

otherwise required for such sales.  *See Summers*, 555 U.S. at 490.  In ruling that the

plaintiffs lacked standing, the *Summers* Court noted that "[t]he regulations under

challenge here neither require nor forbid any action on the part of" the plaintiffs, but

rather "govern only the conduct of Forest Service officials engaged in project

planning."  *Id.* at 493.  In such circumstances, said the Court, plaintiffs can

"demonstrate standing only if application of the regulations by the Government will

affect *them* in the manner described [in the complaint]."  *Id.* at 494 (emphasis in

original).  Ultimately, the Supreme Court found that the plaintiffs lacked standing

because they had failed "to allege that *any* particular timber sale or other project

claimed to be unlawfully subject to the regulations will impede a specific and concrete"

interest of the plaintiffs in the national forests.  *Id.* at 495 (emphasis in original).

Furthermore, the *Summers* Court explicitly rejected a theory of standing (posed in

dissent) that was based on the "statistical probability that some of [the members of

plaintiff organizations] are threatened with concrete injury."  *Id.* at 497.  Instead, the

majority held that "this novel approach to the law of organizational standing would

make a mockery of our prior cases, which have required plaintiff-organizations to make

specific allegation establishing that at least one identified member had suffered or

would suffer harm."  *Id.*  at 497–98.

 So it is here.  The 2012 Planning Rule, much like the rule at issue in *Summers*,

governs only agency conduct.  Therefore, under *Summers*' reasoning, Plaintiffs do not

have standing to challenge the 2012 Planning Rule unless and until they have been—or

certainly will be—harmed by a specific land management action, that was made

pursuant to a land management plan, which was (in turn) developed pursuant to the

2012 Planning Rule.  It is simply not enough for Plaintiffs to say that, by virtue of their

size and membership, their constituent organizations use all of the national forests, and

therefore are affected by any regulation pertaining to those forests.  *See id.* at 496

(refusing to "assume not only that [plaintiff] will stumble across a project tract

unlawfully subject to the regulation, but also that the tract is about to be developed by

the Forest Service in a way that harms his recreational interests").  And that is really all

that Plaintiffs are saying here.  (*See, e.g.,* Pl. Reply Br. at 15 (" Plaintiffs' injuries have

the same nationwide distribution as the plaintiffs themselves (and their members) and

are particularized because the Rule will necessarily affect *every* national forest and the

related thousands of projects, permits and sites used and visited by plaintiffs'

members." (emphasis in original)).)

> 3. Plaintiffs Have Not Demonstrated That The 2012 Rule Substantially
>    Increases The Risk Of Wildfires And Insect Infestations

In addition to Plaintiffs' contention that the 2012 Planning Rule will cause an

economically detrimental decrease in timber harvest and grazing levels, Plaintiffs also

argue that all three plaintiff subgroups will suffer "environmental injury" due to an

increased risk of wildfires and insect infestations in the national forests as a result of

the 2012 Planning Rule.  (*See* Pl. Br. at 19–21.)[16]  Plaintiffs' fears of an increased risk

of wildfire and insect infestations are plainly based entirely on the flawed premise that

the 2012 Planning Rule itself limits timber harvest levels, and thus, this wildfire risk

injury fails at the outset for the reasons discussed in Part IV.A.1, *supra*.  But even

assuming *arguendo* that the 2012 Planning Rule limits harvest and grazing levels, and

---

[16] The alleged imminent threat of increased wildfires and insect infestations also bear on Plaintiffs'
economic injury arguments, as noted above; however, these alleged injuries also appear to be the basis
for Plaintiffs' separate assertion of "environmental" harm.  (*See* Pl. Br. at 22–23.)

thus leads to unmanaged forest growth, this Court finds that Plaintiffs have not demonstrated adequately that there would be a substantially increased risk of wildfires or invasive insects such that their claimed increased-risk theory of injury-in-fact would give rise to Article III standing.

The Supreme Court has "repeatedly reiterated that a 'threatened injury must be *certainly impending* to constitute injury[-]in[-]fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 133 S. Ct. at 1147 (quoting *Whitmore*, 495 U.S. at 158) (emphasis in original).  Thus, "[a]lthough the D.C. Circuit has not closed the door to all increased-risk-of-harm cases, the door remains only slightly ajar." *Ass'n of Am. Physicians & Surgeons v. FDA*, 539 F.Supp.2d 4, 17 (D.D.C. 2008), aff'd sub nom. *Ass'n of Am. Physicians v. FDA*, 358 F. App'x 179 (D.C. Cir. 2009) (internal quotation marks and citations omitted).  "[A] plaintiff who plans to satisfy the imminent injury requirement by alleging that the challenged act will increase the risk of harm to [the plaintiff], must do more than merely assert that there is some conceivable risk that [plaintiff] will be harmed on account of the defendant's actions." *Food & Water Watch*, 2015 WL 514389, at *9.  Instead, such a plaintiff must demonstrate that it faces "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account.'" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 513 F.3d 234, 237 (D.C. Cir. 2008) (emphasis in original) (quotation marks and citation omitted)).  Moreover, "[i]n applying the 'substantial' standard, we are mindful, of course, that the constitutional requirement of imminence as articulated by the Supreme Court . . . necessarily compels a very strict understanding of what

increases in risk and overall risk levels can count as 'substantial.'" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1296 (D.C. Cir. 2007).

In support of their argument that the 2012 Planning Rule increases the risk of injury to Plaintiffs from wildfire and insect infestations, Plaintiffs point once again to *Mountain States*. (*See* Pl. Reply at 12 (citing *Mountain States*, 92 F.3d at 1234–35).) There, in addition to the holding regarding the injury from reduced timber harvest discussed above, *see supra* Part IV.A.1, the D.C. Circuit found that "Plaintiffs' aesthetic and environmental interests in having such areas free of devastating forest fire are clearly sufficient for Article III standing." *Mountain States*, 92 F.3d at 1234; *see also Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 252 (D.D.C. 2011) (relying on *MLSF* to find that timber companies had standing to challenge the revision of a decision regarding the level of harvesting allowed in a national forest). And it is clear that the D.C. Circuit's standing conclusion was based on extensive and detailed evidence from the EIS regarding such increased risk of wildfire. *See Mountain States*, 92 F.3d at 1234–35.

There are no such findings in the EIS presented here; instead, Plaintiffs rely solely on *historical* figures showing that wildfires have increased as timber harvesting has decreased over the last 20 years. (*See* Pl. Br. at 19.) And while this may or may not be true as a matter of common forestry knowledge, the instant record simply fails to support the assumption that there is any causal connection between decreased harvesting and increased wildfires. *See Cal. Forestry Ass'n*, 936 F. Supp. at 20 (noting that standing cannot rest on an injury that "depends largely upon speculations about the natural course of forest development"). Moreover, and importantly, the text of the 2012

Planning Rule directly addresses wildfires and insect infestations by requiring each forest plan to include components that maintain or restore ecological sustainability, taking into account "wildland fire [and] invasive species[,]" and it also mandates that planners consider "wildland fire and opportunities to restore fire adapted ecosystems" when developing plan components.  36 C.F.R. § 219.8(a)(1)(iv), (v).  Thus, forest plans ultimately developed under the 2012 Planning Rule may well include components designed to *reduce* the risk of wildfire and insect infestation, despite the purported reduction in harvest levels that Plaintiffs' assert will follow from implementation of the Rule.  Consequently, this Court refuses to speculate that land management plans that are developed pursuant to the 2012 Planning Rule will necessarily increase the risk of wildfire and insect infestation, and therefore will not rule that Plaintiffs have satisfied their burden of establishing an injury-in-fact for standing purposes on the basis of the alleged wildfire-risk injury.

### B.    Plaintiffs' Alleged Procedural Injury Is Not Connected To A Substantive Injury

Turning from the alleged economic and environmental injuries premised on decreased timber harvesting, decreased availability of public lands for grazing, and increased chances of wildfire, Plaintiffs also argue that they have standing to sue because they have suffered procedural injury due to the Forest Service's failure to allow them to comment on certain terms defined in the Planning Rule.  Specifically, Plaintiffs allege that they "actively participated in the rulemaking process but were denied an opportunity to weigh in on" three key terms: ecological integrity, riparian areas, and riparian management zone.  (Pl. Br. at 23 (citing Van Liew Dec. ¶¶ 5, 10, 19; Partin Dec. ¶ 3; Amador Dec. ¶¶ 6-7).)  Plaintiffs claim that the Forest's Service's alleged

failure to submit these definitions for public comment violates both the NFMA's and
the APA's notice and comment requirements (*see* Pl. Br. at 24; Pl. Reply at 26) and
claim that the allegedly new definitions will lead to "severe restrictions on timber
production and grazing" (Pl. Br. at 26) such that a finding of procedural injury is
warranted.  Plaintiffs are mistaken; "a plaintiff may have standing to challenge the
failure of an agency to abide by a procedural requirement[,]" *Fla. Audubon*, 94 F.3d at
664, but only "if it can show that an agency failed to abide by a procedural requirement
that was 'designed to protect some threatened concrete interest' of the plaintiff," *Ctr.
for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009)
(quoting *Lujan*, 504 U.S. at 573 n.8); *see also Summers*, 555 U.S. at 496 ("deprivation
of a procedural right without some concrete interest that is affected by the
deprivation—a procedural right *in vacuo*—is insufficient to create Article III
standing").  Plaintiffs here have failed to demonstrate that the allegedly unvetted
definitions threaten Plaintiffs' concrete interests because, as explained above, there is
no indication that any new forest management plan developed pursuant to the 2012
Planning Rule and its definitions will, in fact, reduce the amount of land that is
available for timber harvest and grazing.

   This Court also rejects Plaintiffs' contention that a cognizable procedural injury
arises from "the Forest Service's new limitation on decision making information, i.e.
the best available science constraint on forest planning," which Plaintiffs say "prevents
plaintiffs from participating in the planning process to the extent they provide public
comment based on such things as local experience and personal knowledge[.]"  (Pl. Br.
at 23 (citing Van Liew Dec. ¶ 15).)  Nothing in 36 C.F.R. § 219.3 precludes

consideration of non-scientific information; therefore the best available science requirement does not threaten the Plaintiffs' interest in commenting on forest management plans developed pursuant to the 2012 Planning Rule in any respect. Indeed, the 2012 Planning Rule itself states in no uncertain terms that "[w]hile [the best available scientific information] must inform the planning process and plan components, it does not dictate what the decision must be. . . . [O]ther factors [in the planning process] include budget, legal authority, local and indigenous knowledge, Agency policies, public input, and the experience of land managers." 77 Fed. Reg. at 21,193.

In sum, while Plaintiffs' declarants speculate that the terms on which they allegedly could not comment could be construed to limit timber harvests, or narrow their ability to comment on future forest management plans, these speculative and generalized fears fall short of demonstrating an impact to a concrete interest in a manner that gives rise to "procedural" injury for the purpose of Article III standing. *See Ctr. for Biological Diversity*, 563 F.3d at 478.

## V.   CONCLUSION

Plaintiffs have failed to show that the 2012 Planning Rule threatens an injury-in-fact that is imminent, or particularized.  Moreover, because the injuries that Plaintiffs allege cannot be traced to the challenged action of the defendant, Plaintiffs have failed to demonstrate that the 2012 Planning Rule will cause them harm.  Consequently, Plaintiffs lack standing, and, as set forth in the previously filed Order, Plaintiffs' Motion for Summary Judgment is **DENIED**; Defendants' Motion to Dismiss is

**GRANTED**, and Intervenor-Defendants' Motion for Summary Judgment is **DENIED** as moot.

DATE:  April 28, 2015                    *Ketanji Brown Jackson*
                                         KETANJI BROWN JACKSON
                                         United States District Judge